**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| Shelley Bridges, Lisa Blakemore, *and* Teresa Lukaszewicz, *individually and on behalf of all others similarly situated*, | Case No. 1:24-cv-00087 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| Raycen Raines, Wakpamni Lake Community Corporation, WLCC II d/b/a Arrowhead Advance, WLCC Lending BGL d/b/a Bison Green Lending, WLCC Lending JEM d/b/a Explore Credit, WLCC Lending FDL d/b/a Fast Day Loans, WLCC Lending FDL d/b/a First Day Loan, *and* John Does Nos. 1-40. | |
| Defendants. | |

COME NOW Plaintiffs Shelley Bridges, Lisa Blakemore, and Teresa Lukaszewicz, *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants, allege as follows:

## GENERAL ALLEGATIONS

1. This is a case about a scheme to make online, short-term loans that carry interest rates exceeding 600 percent—loans that are illegal in many states—and to do so with impunity.

2. High interest loans target vulnerable borrowers and, left unregulated, economically devastate borrowers and their communities. Once saddled with a predatory loan of this sort, consumers will often take out additional loans to make ends meet and to pay off other loans, creating a cycle of mounting debt.

3. In an attempt to evade litigation and government enforcement aimed at halting these illegal lending schemes, predatory lenders have sought to cloak themselves with the sovereign

immunity granted to American Indian tribes in the United States. These predatory lenders pretend to be companies created and run by tribes when, in all reality, they are run by non-tribal third parties and the profits that the companies extract from consumers do not inure to the benefit of the tribes whose immunity these predatory lenders seek to exploit. Courts routinely reject such cynical efforts to use tribal immunity to shield plainly illegal commercial conduct.

4.       At issue in this case is one such predatory "rent-a-tribe" lending scheme.

5.       Raycen Raines and his company, Wakpamni Lake Community Corporation ("WLCC"), have created and facilitated the operations of a series of related predatory lending entities, including, but not limited to, the five that ensnared Plaintiffs: WLCC II d/b/a Arrowhead Advance ("Arrowhead Advance"), WLCC Lending BGL d/b/a Bison Green Lending ("Bison Green"), WLCC Lending JEM d/b/a Explore Credit  ("Explore Credit"), WLCC Lending FDL d/b/a Fast Day Loans ("Fast Day Loans"), and WLCC Lending FDL d/b/a First Day Loan ("First Day Loan").

6.       Raines and WLCC maintain that WLCC-affiliated companies like Arrowhead Advance, Bison Green, Explore Credit, Fast Day Loans, and First Day Loan are tribal entities sanctioned by the Oglala Sioux Tribe of South Dakota ("Oglala Sioux" or "Tribe") and the Wakpamni District ("District"), one of the Tribe's regional subdivisions.[1] Defendants so maintain despite the Tribe's and the District's express repudiation of any such affiliation or official sanction.

---

[1] The State of Washington Department of Financial Institutions, *The Wakpamni Lake Community of the Oglala Sioux Tribe - Tribal Lender Not Licensed in Washington State* (May 1, 2023), https://dfi.wa.gov/consumer/alerts/wakpamni-lake-community-oglala-sioux-tribe-tribal-lender-not-licensed-washington.

7.     Raines and his non-tribal business associates have been running lending schemes for years, making usurious loans to consumers located throughout the United States. These schemes have been highly lucrative. These schemes are also illegal.

8.     Plaintiffs, on behalf of themselves and the Classes set forth below, seek to recover damages and penalties under state and federal law for the usurious interest and fees obtained by Defendants.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction over Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1962, and 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

10.    This Court also has jurisdiction under the Class Action Fairness Act because Plaintiffs and at least one Defendant are citizens of different states and the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff Shelley Bridges' claims occurred in Morganton, North Carolina, including in this District and Division. Additionally, venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants transacted their affairs in this District and Division.

## THE PARTIES

12.    Plaintiff Shelley Bridges is a natural person, citizen of North Carolina, and resident of Morganton, North Carolina.

13.    Plaintiff Lisa Blakemore is a natural person, citizen of Tennessee, and resident of Memphis, Tennessee.

14.     Plaintiff Teresa Lukaszewicz is a natural person, citizen of Wisconsin, and resident of South Milwaukee, Wisconsin.

15.     Defendant Raycen Raines is a natural person and citizen of South Dakota, who resides at 3503 Chapel Valley Road, Rapid City, SD 57702. Raines has reportedly also gone by the following names: Raycen A. Ballard, Raycen A. Horseballard, Raycen C. Rummel, and Raycen American Horse Raines.[2] Raines is a board member and the Chief Executive Officer of the Wakpamni Lake Community Corporation.

16.     Defendant Wakpamni Lake Community Corporation ("WLCC") is a privately held corporation, which operates without approval from and provides no benefit to the Oglala Sioux Tribe or the Wakpamni District. WLCC allows internet lending websites to use its name and claim its falsified tribal affiliation. That is, these WLCC-affiliated lenders each claim to be a tribal corporation owned entirely by the Wakpamni Lake Community of the Oglala Sioux, thus seeking to launder the Tribe's sovereign immunity to shield Defendants from liability.[3]

17.     Defendant WLCC II d/b/a Arrowhead Advance ("Arrowhead Advance") claims to be a subsidiary of "a tribal corporation wholly owned by the Wakpamni Lake Community," which it in turn maintains "is a local government under the Oglala Sioux Tribe" and "is responsible for the economic development of the Wakpamni Lake Community."[4]

18.     Defendant WLCC Lending BGL d/b/a Bison Green Lending ("Bison Green") claims to be "a Native American owned business operating within the interior boundaries of the

---

[2] Brandon Ecoffey, *Oglala man's business dealings under scrutiny*, Native Sun News (Aug. 19, 2014), https://indianz.com/News/2014/08/19/native-sun-news-oglala-mans-bu.asp.
[3] Explore Credit, https://explorecredit.com/ (last visited Mar. 6, 2024).
[4] Arrowhead Advance, https://www.arrowheadadvance.com/ (last visited Mar. 6, 2024); Arrowhead Advance, *About Us*, https://www.arrowheadadvance.com/about (last visited Mar. 6, 2024).

4

Pine Ridge Reservation of the Oglala Sioux Tribe" and "an instrumentality and limited liability company which abides by all applicable federal laws, and by all regulations as established by the Oglala Sioux Tribe of South Dakota."[5]

19. Defendant WLCC Lending JEM d/b/a Explore Credit ("Explore Credit") claims to be "an entity of the Wakpamni Lake Community Corporation (WLCC), a tribal corporation wholly owned by the Wakpamni Lake Community," which Explore Credit claims "is a local municipal subsidiary government under the Oglala Sioux Tribe."[6]

20. Defendant WLCC Lending FDL d/b/a Fast Day Loans ("Fast Day Loans") claims to be a "subsidiary agency" of the Wakpamni Lake Community Corporation, which it claims is "an arm and entity organized under and governed by the laws of the Oglala Sioux of the Pine Ridge Reservation."[7]

21. Defendant WLCC Lending FDL d/b/a/ First Day Loan ("First Day Loan") claims to be a "subsidiary agency" of the Wakpamni Lake Community Corporation, which it claims is "an arm and entity organized under and governed by the laws of the Oglala Sioux of the Pine Ridge Reservation."[8]

22. Defendant John Doe Nos. 1-40 are unidentified parties who participated in the enterprise with the Defendants, including, but not limited to, individuals and entities who aided, abetted, and facilitated the conspiracy to collect the unlawful amounts from consumers.

---

[5] Bison Green, https://www.bisongreen.com/Default.aspx (last visited Mar. 6, 2024).
[6] Explore Credit, *supra* note 3.
[7] FastDayLoans, https://www.fastdayloans.com/ (last visited Mar. 6, 2024).
[8] FirstDayLoan, https://www.firstdayloan.com/ (last visited Mar. 6, 2024).

5

# FACTUAL ALLEGATIONS

**The Emergence of the Tribal Lending Scheme**

23.     In a tribal lending scheme, a lender affiliates with a Native American tribe in the United States in an attempt to enhance the appearance of tribal ownership of the business and insulate the scheme from federal and state law. The lender does so by piggybacking on the tribe's sovereign legal status and the tribe's general immunity from suit under federal and state laws.

24.     The purpose of the scheme is clear; non-tribal schemers "use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

25.     Tribal lending schemes are not designed to promote tribal business or prosperity. Rather, tribal lending schemes are contrivances aimed at avoiding state usury laws, with the vast majority of the businesses' revenue being funneled to non-tribal entities and with the tribes typically receiving, at most, one or two percent of the businesses' revenue.

26.     In recent years, these schemes have come under increased scrutiny from regulators, with one prominent perpetrator having been convicted and sentenced to 16 years in prison for federal racketeering and truth-in-lending offenses.[9]

**Defendants' Falsified Tribal Affiliation with the Oglala Sioux**

27.     Defendant Raines is an insurance salesman who was born in Portland, Oregon, and

---

[9] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday.

6

raised in Sitka, Alaska. In or around 2011, Raines, pointing to purported Oglala blood on his father's side, moved to South Dakota and sought enrollment in the Oglala Sioux Tribe.[10]

28. The Pine Ridge Reservation of South Dakota ("the Reservation"), which is governed by the Oglala Sioux Tribe, is one of the poorest regions in the United States. Tribal officials estimate that the unemployment rate on the Reservation is at 80 percent, with that rate climbing even higher in winter months when there is no demand for seasonal farm and ranch work in the region.[11]

29. Soon after moving to South Dakota, and in an attempt to prey upon the Tribe's financial distress, Raines approached the Tribe and tried to convince it to become a co-conspirator in his money-making scheme. Having learned of this new lending model and the profits flowing from it to others, Raines wanted to create a scheme to lend money to desperate people at triple-digit interest rates while cloaking himself and his predatory lending scheme in the Tribe's own sovereign immunity—thereby insulating him and his businesses from suit. Raines pitched the scheme as part of a booming industry and promised the Tribe that if it allowed him to launder the Tribe's sovereign immunity, Raines would give the Tribe a cut of the action, bringing in "a free income stream" to the impoverished community.[12]

---

[10] *See* Nicholas Nehamas, *Payday Nation: The tribe that said no*, Al Jazeera (Jun. 18, 2014), http://projects.aljazeera.com/2014/payday-nation/sioux-tribe-payday.html#:~:text=Raycen%20Raines%2C%20a%20former%20insurance,income%20stream%E2%80%9D%20to%20the%20tribe.; Brandon Ecoffey, *Oglala man's business dealings under scrutiny*, Native Sun News (Aug. 19, 2014), https://indianz.com/News/2014/08/19/native-sun-news-oglala-mans-bu.asp.

[11] *See* Nehamas, *supra* note 10; *Tribal Infrastructure: Roads, Bridges, and Buildings: Hearing before the Subcomm. For Indigenous Peoples of the United States of the H. Nat. Res. Comm.*, 116th Cong. (2019) (written testimony of Julian Bear Runner, President of the Oglala Sioux Tribe), https://www.congress.gov/116/meeting/house/109756/documents/HHRG-116-II24-20190711-SD004.pdf (last visited Mar. 6, 2024).

[12] *See* Nehamas, *supra* note 10.

30.     The Tribe rejected Raines's offer.[13]

31.     But Raines had a back-up plan, and next sought to persuade the Wakpamni District, one of the Reservation's nine regional subdivisions, to join in his predatory lending scheme.[14]

32.     The Reservation is governed by a President and Legislative Council, both elected by the Tribe as a whole. But, as one of the Reservation's regional subdivisions, the Wakpamni District has its own local government and is empowered, under certain circumstances, to make business deals without permission from the Tribe's Legislative Council.[15]

33.     The Wakpamni District's Constitution and By-Laws provide that the Wakpamni District's government is to be made up of a District Executive Board and a District Council. The District Council, which consists of representatives from each of the six communities within the District, is empowered to determine the community's wishes, while the District Executive Board's mandate is to carry out those wishes. For the Wakpamni District to convene a legal District Council meeting, the meeting must be attended by District Council members from at least four of the six communities within the Wakpamni District, with a quorum of five members per community. Only once such a quorum is convened may the District Council collectively vote on issues and business proposals brought to the Wakpamni District.[16]

34.     In January 2012, Raines approached the Wakpamni District, once again peddling his predatory lending scheme to members of the Tribe. Raines brought with him, to share with the

---

[13] *Id.*

[14] *Id.*

[15] *See id.*

[16] *See* Natalie Hand, *Black Hills Treaty Council wins judgment against RainDancer Resource Management*, Intercontinental Cry (Jan. 30, 2012), https://intercontinentalcry.org/black-hills-treaty-council-wins-judgment-against-raindancer-resource-management/.

8

audience of about 40 people, a proposed partnership agreement between his company and the Wakpamni District.[17]

35.     Pursuant to this proposed agreement, Raines would create a tribal lending scheme shrouded in the cloak of the Wakpamni District's tribal sovereignty. Under the terms of the agreement, Raines's company would deposit, into an account held by Raines, $5 for each new loan the company originated, with a cap of $100,000 in $5 origination fees each month. If the total of the accumulated $5 origination fees exceeded the $100,000 cap in a single month, Raines's company would deposit into Raines's account $2.50 in origination fees for each subsequent originated loan. Raines proposed that he and the Wakpamni District could then split these origination fees equally.[18]

36.     Although the then-president of the Wakpamni District, Sandy Two Lance, supported Raines's proposal, the other three members of the District's Executive Board present at the meeting that day were more skeptical, with one Executive Board member having already been warned days earlier by the Tribe's attorney that entering into such an agreement with Raines "would result into a huge legal liability" for the District and the Tribe, more generally.[19]

37.     Realizing that she did not have the Executive Board votes she needed, Two Lance put Raines's proposal up for a vote of all those present at the meeting.

38.     The attendees present at the meeting were insufficient to constitute a proper quorum under the Wakpamni District's Constitution and By-Laws, and as such Two Lance and the District could not properly or legally put the decision to a floor vote.[20]

---

[17] *See* Nehamas, *supra* note 10.
[18] *Id.*
[19] *See id.*
[20] *See* Hand, *supra* note 16; Nehamas, *supra* note 10.

9

39.     Two Lance nevertheless proceeded with the floor vote. One attendee voted against Raines's proposal and the three Executive Board members present at the meeting abstained from the vote in protest.[21] Two Lance, despite lacking the legal authority to do so, then signed Raines's proposed partnership agreement.[22]

40.     Since that evening, and despite Two Lance's execution of the contract with Raines, the Wakpamni District has refused to honor the partnership agreement, citing the fact that the contract was entered into illegally. Raines, for his part, has not shared the profits from his predatory lending scheme with the tribal government, as he had promised to do under the terms of the contract Two Lance executed.[23]

41.     Despite the invalidity of his contract with the Tribe, the illegality of the floor vote that led to the contract's execution, and the Wakpamni District's repudiation of the contract with him, Raines claims that his companies are tribal entities. More specifically, Raines claims that WLCC, the company with which all Raines's predatory lending websites are affiliated, is a tribal corporation wholly owned by the Wakpamni District and affiliated with the Tribe.[24]

42.     WLCC operates without the Tribe's or the District's official sanction, without legal affiliation with the Oglala Sioux Tribe, and without tribal ownership.[25] In fact, WLCC operates contrary to the Tribe's and the District's express wishes that they not be affiliated with WLCC. In January 2012, a tribal court issued a temporary restraining order against another of Raines's predatory business ventures, barring Raines from doing business on the Pine Ridge Reservation.[26]

---

[21] Nehamas, *supra* note 10.
[22] *Id.*
[23] Nehamas, *supra* note 10.
[24] *See* Nehamas, *supra* note 10; Arrowhead Advance, *supra* note 4.
[25] *See* Nehamas, *supra* note 10.
[26] *See* Hand, *supra* note 16.

Raines nevertheless still proclaims that his tribal lending scheme is affiliated with the Tribe and the District.

43.     To further undercut the mirage of tribal identity that Raines has fabricated for his predatory lending scheme, WLCC's lending operations were carried out and continue to be carried out in locations off the Reservation. These off-reservation operations are comprehensive and include, but are not limited to, lead generation, marketing, funding, underwriting, payment processing, and collection.

44.     WLCC and its subsidiaries currently conduct the day-to-day lending operations of the WLCC enterprise in Delaware and Pennsylvania.

45.     The Tribe does not participate in Defendants' day-to-day lending operations.

46.     WLCC formed, conducted, and conducts lending activities through a series of subsidiaries or assumed names. The list of these subsidiaries and assumed names is ever expanding and includes:

     a.     WLCC Lending GEG d/b/a TheGanEdenGroup.com

     b.     WLCC Lending FHC, d/b/a Fox Hills Cash

     c.     WLCC II d/b/a Arrowhead Advance

     d.     WLCC Lending FDL d/b/a FirstDayLoan.com

     e.     Check Advance USA

     f.     WLCC Lending AIL d/b/a GoodLoansFast

     g.     WLCC Lending JEM d/b/a Explore Credit

     h.     WLCC Lending DFG d/b/a Dakota Funding Group

     i.     WLCC Lending DFG d/b/a Eagle Rock Funding

     j.     WLCC Lending CFC d/b/a Consumer First Credit

11

k. WLCC Lending GVF d/b/a Green Valley Funds

l. WLCC Lending FFG d/b/a Falcon Funding Group

m. WLCC Lending MFT d/b/a Quincy Adams Group

n. WLCC LENDING LRG d/b/a MYFULLWALLET

o. WLCC Lending GVF d/b/a Taft Howard Group

p. WLCC Lending FFG d/b/a Fair Trust Group

q. WLCC Lending BGA d/b/a Bison Green Lending

r. Black Hawk Financial d/b/a Myfundingchoices.com

s. WLCC Lending MFT d/b/a Merit Financial Trust

t. WLCC LENDING MSS d/b/a MYBACKWALLET

u. WLCC Lending MFT d/b/a Ocean Park Funding

v. WLCC Lending MFT d/b/a Rain of Cash

w. WLCC Lending FLG d/b/a Lincoln Funding Group

x. WLCC Lending FLG d/b/a Madison Trust Group

y. WLCC Lending FDL d/b/a Fast Day Loans

z. WLCC Lending GEG d/b/a Global Trust Funding

aa. WLCC Lending HBC d/b/a NationalNationLoans.com

bb. Fast Fund Lending

47. Though many of the WLCC subsidiaries' websites falsely claim that the lending headquarters for these companies are located on the Reservation at "1 Wakpamni Lake Road, Wakpammi Lake, SD 57716," almost none of these companies list a mailing address on the Reservation. Instead, most of WLCC's subsidiaries list off-reservation mailing addresses, if any address at all. The off-reservation mailing addresses of the identified WLCC subsidiaries or

affiliates include: "PO Box 157, Claymont, DE 19703," "1100 S. Market St. #70, Solon, IA 52333," "P.O. Box 260269, Atlanta, GA 30326," "PO Box 637, 333 South Main St, Blanding UT 84511," "P.O. Box 170, Provo, UT 84603," "PO Box 212, Batesland, SD 57716," "1365 Business Park Dr. Suite #200, Orem, UT 84058," and "1601 GA HWY 40 E Suite M#247, Kingsland, GA 31548."

48. Raines and WLCC created many different electronic storefronts to facilitate the illegal lending enterprises and the distribution of the profits from the illegal loans to the various nontribal outsiders who are involved in this scheme. Raines, WLCC and its subsidiaries and affiliates, and the non-tribal outsiders took the following actions in furtherance of the schemes:

- Registering the website domains;

- Creating website content that claims an illegitimate tribal affiliation;

- Obtaining consumer reports on consumers from consumer reporting agencies in order to evaluate consumer credit;

- Developing underwriting criteria for lending;

- Engaging in marketing activities, including communicating with consumers urging them to take out loans or additional loans;

- Creating incentive programs to encourage consumers to continuing borrowing;

- Drafting loan contracts and other policy documents claiming an illegitimate tribal affiliation;

- Employing a bank to provide access to the ACH network to facilitate depositing and withdrawing money from consumer bank accounts through the automated clearing house;

- Accepting and processing loan payments through other means than the ACH network;

- Servicing the loans, including engaging in debt collection activities such as emailing, calling, and texting consumers urging them to pay off the loans;

- Providing funds to finance the loans and other activities of the lending scheme; and

- Repaying investors in the lending schemes.

49.     All the profits made under these names did not go to the Tribe but, instead, went to Raines and nontribal outsiders who have attempted to exploit sovereign immunity to protect themselves from liability for their violations of state and federal laws.

**Defendants' Tribal Lending Schemes at Issue in this Case**

50.     The illegal practices that Raines employs to carry out his predatory lending scheme do not end with WLCC's false claim of tribal affiliation and sanction.

51.     Raines, WLCC, and WLCC's subsidiaries and affiliates are also not licensed to lend in the states in which they are lending and are lending at interest rates that are illegal in many states. The only licenses that Defendants purport to have been issued in connection with their predatory lending scheme are a series of "Consumer Loan License[s]" issued by WLCC pursuant to "Section 4 of the Tribal Credit Code" of the Oglala Sioux or "Section 7 of the Consumer Loan Ordinance" of the Oglala Sioux. There are clear problems with these licenses. First, the licenses claim that WLCC is a "wholly owned economic development arm of the Wakpamni Lake Community, a local subsidiary government of the Tribe." This a false statement. WLCC is a shell company that Raines created as part of his predatory tribal lending scheme. The Wakpamni District and the Tribe have refuted any affiliation with—let alone governmental incorporation or sanction of—WLCC. Second, per the Constitution of the Oglala Sioux Tribe, it is the Tribal Council that

"manage[s] all economic affairs and enterprises of the Oglala Sioux Tribe" as a whole. A regional district does not have the authority to run a lending enterprise on behalf of the Tribe as a whole, and a shell corporation falsely claiming to be affiliated with a regional district certainly has no such authority. Lastly, and perhaps most remarkably, at least two of these licenses were purportedly issued and executed by Geneva Lone Hill on October 21, 2023, which is a date that falls an inexplicable six days after Lone Hill's death on October 15, 2023.

52.     Defendants offered and continue to offer short-term loans with exorbitant finance charges and triple-digit interest rates. Because of the high interest rates attached to these loans, the finance charges that consumers pay often quickly exceed the amount borrowed. Although consumers would ideally rarely, if ever, need to take out a small sum, short-term loan with a high interest rate, consumers often find themselves in a destructive feedback loop wherein they are forced to take out a series of these loans to make ends meet and/or to pay off prior loans, losing thousands of dollars to exorbitant finance charges in the process.

53.     Under the terms of these WLCC-affiliated loan agreements, Defendants lent to borrowers sums of $1,000 or below and charged annual interest rates in the high triple digits, up to almost 800 percent in at least two instances. As a result of these exorbitant finance charges, Plaintiffs ended up owing multiple times the amount of money that they initially borrowed.

54.     The interest rates that Defendants charged under these loan agreements were also many times the caps imposed by state law in a number of the jurisdictions in which the Plaintiffs reside.

**Plaintiff Bridges**

55.     From her residence in Morganton, North Carolina, Plaintiff Shelley Bridges applied for and took out one loan with Bison Green over the internet in November 2023 and one loan with First Day Loan in September 2023.

56.     Bridges's loan from Bison Green was for $500 and had an interest rate of 677.51 percent. According to the payment schedule, the finance charge on the loan was $1,122.74. After the first month, the weekly payment on the loan was $73.77. If Bridges had made all the payments on her loan according to the payment schedule, she would have ended up paying Defendants $1,622.74 for her $500 loan. After making four weekly payments of $73.77 in December 2023, Bridges secured a loan for $544.98 from a local brick-and-mortar lender. Bridges used this loan to pay her Bison Green loan off in full. Bridges ended up paying $840.06—all in a single month— for her $500 loan from Bison Green.

57.     Bridges's loan from First Day Loan was for $200 and had an interest rate of 773.26 percent. According to the payment schedule, the finance charge on the loan was $575.74. After the first month, the weekly payment on the loan was $31.51. If Bridges had made all the payments on her loan according to the payment schedule, she would have ended up paying Defendants $775.74 for her $200 loan. Bridges has made at least 16 consecutive payments to First Day Loan for this loan, totaling at least $504.16—all for a $200 loan.

58.     North Carolina sets eight percent as the legal rate of interest chargeable to consumers. N.C. Gen. Stat. Ann. § 24-1.

59.     When there is a written contract for loans with a principal amount of $25,000 or less, North Carolina's maximum permitted interest rate is the greater of (A) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the

16

month plus six percent (6%), rounded upward or downward, as the case may be, to the nearest one-half of one percent (1/2 of 1%) or" (B) "sixteen percent (16%)." N.C. Gen. Stat. Ann. § 24-1.1(c).

60.     Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest. N.C. Gen. Stat. § 24-2. If the interest has been paid, the borrower may recover twice the amount of interest paid. *Id.*

61.     North Carolina's Consumer Finance Act ("CFA") provides that for loans of $25,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner. N.C. Gen. Stat. §§ 53-166(a), 53-168.

62.     Defendants were not licensed to lend in North Carolina, and the loans they made carried interest rates well in excess of the caps established under North Carolina law. Defendants' loans to Plaintiff Bridges and other North Carolina residents were, therefore, impermissible under North Carolina law.

**Plaintiff Blakemore**

63.     From her residence in Memphis, Tennessee, Plaintiff Lisa Blakemore applied for and took out one loan with Fast Day Loans over the internet in June 2022 and another with Explore Credit over the internet in June 2023.

64.     The Fast Day Loans loan was for $500. After the first month, the bi-weekly payment on the loan was $158.20. In August 2022, Blakemore paid off the loan early, having paid at least $1,012.75 for a $500 loan.

65.     The Explore Credit loan was for $1,000 and had an interest rate of 792.83 percent. According to the payment schedule, the finance charge on the loan was $6,309.66. After the first

month, the bi-monthly payment on the loan was $279.75. If Blakemore were to have made all her payments on the loan, she would have ended up paying a total of $7,309.66 for a $1,000 loan. Blakemore eventually paid at least $1,678.50 on her $1,000 loan from Explore Credit. Blakemore eventually revoked her authorization to allow Explore Credit access to her bank account.

66.     In Tennessee, the maximum rate of interest is ten percent per annum. Tenn. Code Ann. § 47-14-103.

67.     Defendants charged interest rates well in excess of ten percent per annum to Plaintiff Blakemore and other Tennessee residents. Defendants thus violated Tennessee's usury law.

68.     "If usury has been paid, it may be recovered by action brought by the party from whom it was taken." Tenn. Code Ann. § 47-14-111.

**Plaintiff Lukaszewicz**

69.     From her residence in South Milwaukee, Wisconsin, Plaintiff Teresa Lukaszewicz applied for and took out a loan with Arrowhead Advance over the internet in May 2022.

70.     The loan was for $250 and had an interest rate of 624.64 percent. According to the payment schedule, the finance charge on the loan was $562.84. After the first month, the monthly payment on the loan was $116.09. Lukaszewicz made payments totaling $812.84 to pay off the loan.

71.     Under Wisconsin law, a lender that is lending money with an interest rate exceeding 18 percent per annum is required to obtain a license from the Division of Banking. Wis. Stat. Ann. § 138.09(1m)(a).

72.     Defendants issued loans to Wisconsin residents with interest rates well in excess of 18 percent per annum and did not obtain a license from the Division of Banking.

73.     Wisconsin's usury statute prevents lenders from lending—on loans for under $150,000—with a rate of interest in excess of either (1) 12 percent per annum or (2) six percent per annum for loans that are repayable in weekly or monthly installments and that involve predetermined interest charges. Wis. Stat. Ann. § 138.05(1)-(7).

74.     Defendants charged rates of interest well in excess of both of Wisconsin's usury caps.

## CLASS ACTION ALLEGATIONS

75.     Plaintiffs assert claims on behalf of the proposed National Class defined as follows:

> All United States residents who entered into loan agreements with the Wakpamni Lake Community Corporation or its affiliates or subsidiaries within the applicable statute of limitations. This Class does not include loans that were taken out while a consumer was located in Utah or Nevada.

76.     Plaintiff Bridges asserts claims on behalf of the proposed North Carolina Class defined as follows:

> All North Carolina residents who entered into loan agreements with the Wakpamni Lake Community Corporation or its affiliates or subsidiaries within the applicable statute of limitations.

77.     Plaintiff Blakemore asserts claims on behalf of the proposed Tennessee Class defined as follows:

> All Tennessee residents who entered into loan agreements with the Wakpamni Lake Community Corporation or its affiliates or subsidiaries within the applicable statute of limitations.

78.     Plaintiff Lukaszewicz asserts claims on behalf of the proposed Wisconsin Class defined as follows:

> All Wisconsin residents who entered into loan agreements with the Wakpamni Lake Community Corporation or its affiliates or subsidiaries within the applicable statute of limitations.

## A.     Numerosity

79.     There are hundreds or thousands of members of the Classes. Thus, the Classes are so numerous that joinder of all members is impracticable.

## B.     Commonality

80.     There are numerous common questions of law and fact common to Plaintiffs and the members of the Classes. These questions include, but are not limited to, the following:

       a.     Whether Defendants violated state usury and consumer protection laws;

       b.     Whether Defendants are protected by tribal sovereign immunity;

       c.     Whether Defendants engaged in unfair or deceptive acts or practices;

       d.     Whether Defendants constitute an "enterprise" under RICO;

       e.     Whether Defendants violated RICO by charging interest rates more than the twice the legal limit under state law;

       f.     The scope of any prospective relief; and

       g.     The proper measure and amount of damages for the Classes.

## C.     Typicality

81.     Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Plaintiffs, like members of the Classes, took out usurious loans from Defendants. Thus, Plaintiffs' claims, like the claims of the Classes, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

## D.     Adequacy

82.     Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience litigating tribal lending cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the

Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that conflict with those of the Classes.

**E.    Injunctive Relief**

83.    The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

**F.    Predominance and Superiority**

84.    The Classes meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy for at least the following reasons:

a.    Absent a class action, as a practical matter, members of the Classes will be unable to obtain redress, Defendants' violations will continue without remedy, and additional consumers will be harmed.

b.    It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

c.    A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d.      The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e.      Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of RICO, 18 U.S.C. § 1962(c)**
**(On Behalf of Plaintiffs and the National Class)**
**(Class Claims against Defendants)**

85.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

86.     Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

87.     The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Arrowhead Advance, Bison Green, Explore Credit, Fast Day Loans, First Day Loan, WLCC, and Defendants' other companies involved in the scheme, is in association as an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). The Enterprise associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through online lenders affiliated with WLCC.

88.     The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

89.     Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

90.     RICO defines "unlawful debt" as a debt which was "unenforceable under State law in whole or in part as to principal or interest because of the laws relating to usury," and was

22

incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

91.     All of the loans made to the National Class members and collected by Defendants included an interest rate far in excess of twice the enforceable rate in their respective states.

92.     Defendants charged Plaintiffs interest rates in excess of the maximum rate allowed in their respective states knowingly, deliberately, intentionally, and willfully, with the purpose of taking more than twice the legal rate of interest for the money loaned to Plaintiffs.

93.     Defendants' conduct was not the result of good-faith error, but instead was a knowing, deliberate, intentional, and willful scheme to circumvent laws in Plaintiffs' respective states, and to collect interest at rates more than twice that allowed under those states' laws.

94.     Plaintiffs and the National Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

95.     This conduct continues to date, and will be repeated again and again in the future, to the detriment of consumers.

96.     Accordingly, Defendants are jointly and severally liable to Plaintiffs and the National Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § 1962(d)**
**(On Behalf of Plaintiffs and the National Class)**
**(Class Claims against Defendants)**

97.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

98.     Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

99.     The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Arrowhead Advance, Bison Green, Explore Credit, Fast Day Loans, First Day Loan, WLCC, and Defendants' other companies involved in the scheme, is in fact an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). The Enterprise associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through online lenders affiliated with WLCC.

100.    The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

101.    Defendants violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each Defendant knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

102.    This conduct continues to date, and will be repeated again and again in the future, to the detriment of consumers.

103.    Accordingly, Defendants are jointly and severally liable to Plaintiffs and the National Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**Violations of North Carolina's Usury Law**
**(On Behalf of Plaintiff Bridges and the North Carolina Class)**
**(Class Claims against Defendants)**

104.    Plaintiff Bridges realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

105.    Under North Carolina law, the maximum legal interest rate chargeable to consumers is eight percent per annum. N.C. Gen. Stat. § 24-1.

106.    When parties enter into a written contract for a loan with a principal amount of less than $25,000, North Carolina sets a maximum permissible interest rate, which is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus six percent" rounded to nearest half percent, or (2) 16 percent. N.C. Gen. Stat. § 24-1.1(c).

107.    The loans that Defendants made to Plaintiff Bridges and the North Carolina Class contained interest rates that well exceeded the maximum rates allowed under North Carolina law.

108.    Defendants' conduct in making these loans was knowing, deliberate, intentional, and willful. Defendants' purpose was to extract more than the legal rate of interest for the sums loaned to Plaintiff Bridges and members of the North Carolina Class.

109.    Because Defendants' violations were willful, Plaintiff Bridges and the North Carolina Class are entitled to Defendants' forfeiture of the entire amount of interest owed and Plaintiff Bridges and the North Carolina Class may recover twice the amount of the interest rate paid. N.C. Gen. Stat. § 24-2.

**FOURTH CAUSE OF ACTION**
**Violations of the North Carolina Consumer Finance Act**
**(On Behalf of Plaintiff Bridges and the North Carolina Class)**
**(Class Claims against Defendants)**

110.    Plaintiff Bridges realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

111.    The North Carolina Consumer Finance Act provides that a lender of loans of $15,000 or less may not charge interest greater than that permitted under North Carolina's general

usury law without first obtaining a license from the North Carolina Commissioner. N.C. Gen. Stat. § 53-166(a).

112.    A person who fails to comply with the North Carolina Consumer Finance Act's requirements "is guilty of a Class 1 misdemeanor." N.C. Gen. Stat. § 53-166(c). Moreover, "[a]ny contract of loan, the making, servicing, or collecting of which violates any provision of [the North Carolina Consumer Finance Act] . . . except as a result of accidental or bona fide error of computation is void, and the licensee or any other party in violation shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." *Id.* § 53-166(d).

113.    All of the loans Defendants made to Plaintiff Bridges and the North Carolina Class were for $15,000 or less and carried interest rates well in excess of the maximum rates allowed under North Carolina law.

114.    At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the State of North Carolina. As a result, Defendants' conduct at issue herein is both unlawful and criminal.

115.    Defendants' conduct was not the result of an accidental or bona fide error but instead was a deliberate, willful, and intentional scheme to circumvent North Carolina law and to collect interest at rates well in excess of the legal limits thereupon. Plaintiff Bridges and the North Carolina Class seek a declaration that such loans are void.

116.    Defendants have no right to any principal, interest, or charges on the loans, and Plaintiff Bridges and the North Carolina Class seek restitution of all amounts paid to Defendants.

## FIFTH CAUSE OF ACTION
### Violations of the North Carolina Unfair and Trade Practices Act
### (On Behalf of Plaintiff Bridges and the North Carolina Class)
### (Class Claims against Defendants)

117.    Plaintiff Bridges realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

118.    Defendants' conduct alleged herein constitutes "unfair or deceptive acts or practices in or affecting commerce" in violation of N.C. Gen. Stat. § 75-1.1. This alleged conduct substantially affected commerce in the State of North Carolina and throughout the United States.

119.    Defendants' conduct here was unfair as it was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

120.    Defendants made loans in North Carolina that falsely claimed a tribal affiliation and that violated North Carolina's usury laws.  All of the loans Defendants made to Plaintiff Bridges and the North Carolina Class were for $15,000 or less and carried interest rates well in excess of the maximum rates allowed under North Carolina law.  The conduct violates the North Carolina Unfair and Trade Practices Act.

121.    As a result of Defendants' violations of the North Carolina Unfair and Trade Practices Act, Plaintiff Bridges and the North Carolina Class seek treble damages, plus reasonable attorneys' fees and court costs, pursuant to N.C. Gen. Stat. § 75-16.

## SIXTH CAUSE OF ACTION
### Violations of Tennessee's Usury Law
### (On Behalf of Plaintiff Blakemore and the Tennessee Class)
### (Class Claims against Defendants)

122.    Plaintiff Blakemore realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

123.    In Tennessee, the maximum rate of interest is ten percent per annum. Tenn. Code Ann. § 47-14-103.

27

124. Defendants charged interest rates well in excess of ten percent per annum to Plaintiff Blakemore and the Tennessee Class. Defendants thus violated Tennessee's usury law.

125. "If usury has been paid, it may be recovered by action brought by the party from whom it was taken." Tenn. Code Ann. § 47-14-111.

126. Plaintiff Blakemore and the Tennessee Class are thus entitled to recover the usurious payments they made to Defendants.

**SEVENTH CAUSE OF ACTION**
**Violations of Wisconsin's Usury Law**
**(On Behalf of Plaintiff Lukaszewicz and the Wisconsin Class)**
**(Class Claims against Defendants)**

127. Plaintiff Lukaszewicz realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

128. Wisconsin's usury statute prevents lenders from lending—on loans for under $150,000—with a rate of interest in excess of either (1) 12 percent per annum or (2) six percent per annum for loans that are repayable in weekly or monthly installments and that involve predetermined interest charges. Wis. Stat. Ann. § 138.05(1)-(7).

129. Defendants charged rates of interest well in excess of both of Wisconsin's usury caps.

130. Defendants thus violated Wisconsin's usury law.

131. Plaintiff Lukaszewicz and the Wisconsin Class are, therefore, entitled to recover from Defendants the amount of interest, charges, and up to $2,000 in principal paid on their loans. Wis. Stat. Ann. § 138.06(3).

**EIGHTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the National Class)**
**(Class Claims against Defendants)**

132. To the detriment of Plaintiffs and the National Class members, Defendants have been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates from Plaintiffs and National Class members.

133. As between the parties, it would be unjust for Defendants to retain the benefits attained by their actions. Accordingly, on behalf of themselves and members of the National Class, Plaintiffs seek a full accounting and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

## NINTH CAUSE OF ACTION
**Civil Conspiracy**
**(On Behalf of Plaintiffs and the National Class)**
**(Class Claims against Defendants)**

134. All of the loans to consumers made in the name of Defendants' lending company WLCC or any of its affiliates or subsidiaries violated Plaintiffs and the National Class members' respective states' interest rates and lending laws.

135. Defendants conspired amongst themselves and with other actors to violate state usury and lending laws and profit from those violations.

136. Accordingly, on behalf of themselves and the members of the National Class, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A. An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2) and (b)(3), and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B. An Order declaring that Defendants are financially responsible for notifying members of the Classes of the pendency of this suit;

29

C.     An Order declaring that Defendants have committed the violations of law alleged herein;

D.     An Order providing for any and all injunctive relief the Court deems appropriate;

E.     An Order awarding monetary damages, including, but not limited to, any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.     An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.     An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H.     An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

I.     Such further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs respectfully demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).


Date: March 25, 2024                    /s/Jeffrey Osterwise
                                        BERGER MONTAGUE PC
                                        Jeffrey Osterwise, Bar No. 39272
                                        1818 Market Street, Suite 3600
                                        Philadelphia, PA 19103
                                        T. 215-875-3000
                                        F. 215-875-4604
                                        josterwise@bm.net

                                        E. Michelle Drake*
                                        John G. Albanese*
                                        Marika O'Connor Grant*
                                        BERGER MONTAGUE PC
                                        1229 Tyler Street NE, Suite 205
                                        Minneapolis, MN 55413
                                        T. 612-594-5999

30

F. 612-584-4470
emdrake@bm.net
jalbanese@bm.net
moconnorgrant@bm.net

KELLY GUZZO, PLC
Kristi C. Kelly*
Andrew Guzzo*
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
T. 703-424-7570
kkelly@kellyguzzo.com
aguzzo@kellyguzzo.com

*pro hac vice forthcoming

ATTORNEYS FOR PLAINTIFFS